## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| KEVIN GODERT, AND ALL<br>SIMILARLY SITUATED EMPLOYEES, | )<br>)<br>) | |
| Plaintiff, | )<br>) | CIVIL ACTION NO. |
| VS. | )<br>) | 3:16-CV-2079-G |
| PALO ALTO NETWORKS, INC., | )<br>) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION

### I. INTRODUCTION

This action was brought by the plaintiff, Kevin Godert ("Godert"), against the
defendant, Palo Alto Networks, Inc. ("PAN"). Originally filed in state court, the
defendant removed the case to federal court on the basis of federal question
jurisdiction. Notice of Removal (docket entry 1). Although the court remanded
some of the plaintiff's state law claims before trial, it retained one state law claim and
one federal claim on its docket. *See* Memorandum Opinion and Order at 6 (docket
entry 36). Specifically, the court retained Godert's breach of contract claim as well as
his claim for wages and overtime compensation under the Fair Labor Standards Act

("FLSA"). See *id.* After a two-day bench trial on October 23 and 24, 2017, the court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

1.     PAN is a technology company that emphasizes cyber security. PAN develops and sells advanced firewall systems and other applications to companies. Trial Transcript, Vol. 1, 10:22-24, 12:22-25 (docket entry 57).

2.     PAN employed Godert as a Senior Business Development Representative ("SBDR") from October 2013 until February 2016. Joint Pretrial Order ¶ II (1, 2) (docket entry 45).

3.     Throughout the entirety of his employment with PAN, Godert worked as an SBDR in PAN's Plano, Texas Office. Trial Transcript, Vol 1, 87:15-20; Joint Pretrial Order ¶ II (6).

4.     In his position, Godert marketed the defendant's products and services to potential customers. Trial Transcript, Vol. 1, 20:9-18. One of Godert's responsibilities as an SBDR was to schedule appointments for PAN's field representatives to meet with existing and prospective customers. Trial Transcript, Vol. 1, 21:21-22:15.

5.     To facilitate sales, PAN utilizes both an inside and an outside sales team. Trial Transcript, Vol. 1, 22:11-23:10; 87:25-90:21. SBDRs and Business Development Representatives ("BDRs"), one level below the SBDRs, work on PAN's

inside sales team, Trial Transcript Vol. 1, 92:8-10, while PAN employs a separate outside sales team of Field Representatives. Trial Transcript Vol. 1, 20:19-23, 22:16-23:10. Though PAN assigns different goals and responsibilities to members of the inside sales team and the outside sales team, the two teams often work cooperatively to secure a sale. Trial Transcript, Vol. 1, 88:7-90:21.

6. Godert participated in PAN's hiring process at least once during the time of his employment, when he helped to interview a BDR candidate and was asked to provide a recommendation on whether to hire that candidate. Trial Transcript, Vol. 1, 92:6-93:23. Though Godert recommended that PAN hire the individual he helped to interview, the company did not follow his recommendation. Trial Transcript, Vol. 1-B, 23:7-20 (docket entry 58).

7. Godert sometimes assisted PAN in training new members of the inside sales team. Trial Transcript, Vol. 1, 93:24-94:11.

8. At all times during his employment, PAN paid Godert a salary of not less than $455 a week, which he received semi-monthly. Joint Pretrial Order ¶ II (5); Defendant's Trial Exhibit ("DTE") 1 at PAN_000041.

9. During the course of his employment, Godert had four direct supervisors: Kelly Tulos, Christine Muir, Kevin Hemphill ("Hemphill"), and Andrew Sakelson. Trial Transcript, Vol. 1, 20:24-21:15, Vol. 1-B, 29:14-23.

10.     During Godert's employment, Joshua Hoffman was, and still is, PAN's Vice President of Global Inside Sales.  Trial Transcript, Vol. 1-B, 112:12-13.

11.     All insides sales personnel, including Godert, received a light-weight, portable laptop, and both inside and outside sales representatives were permitted to seek reimbursement for their work-related cell phone charges.  Trial Transcript, Vol. 1-B, 37:23-39:14.

12.     Godert's normal routine while with PAN was to arrive at the office around 7:00 a.m. and leave around 3:00 p.m. or 4:00 p.m.  Trial Transcript, Vol. I, 102:19-103:5.  *See* DTE 24-25.

13.     In addition to receiving a fixed salary, Godert also received commissions.  *See*, *e.g.*, Plaintiff's Trial Exhibit ("PTE") 3 at PAN_000080.  Palo Alto's Employee Handbook stated that PAN reserved the "right to revise, modify, delete, or add to any and all policies, procedures, work rules, or benefits" stated in the handbook or any other document.  DTE 14 at PAN_000151.

14.     Godert received commissions when he set an appointment for a client to meet with an outside sales representative and the appointment was kept.  Trial Transcript, Vol. 1, 32:18-20.  During Godert's employment, PAN switched its plan from paying SBDRs a commission on just "appointments kept" to paying them for "appointments kept" and through a "pipeline" program.  *See* Trial Transcript, Vol. 1, 36:21-38:5.

15.     SBDRs received pipeline-based commissions when outside sales representatives changed the client's status to an "opportunity."  Trial Transcript, Vol. 1-B, 122:5-124:15.

16.     The terms of PAN's commission plans controlled Godert's commissions, and each of the commission plans contains a choice of law clause stipulating that California law would applies to any potential dispute.  *See*, *e.g.*, PTE 6 at PAN_000107.

17.     When inside sales representatives dispute their commissions payment, the representatives go through a "reconciliation" process to determine whether they have been paid correctly.  Trial Transcript, Vol. 1-B, 66:25-68:11.  Though Godert went through the reconciliation process, human resources representatives and members of PAN's inside sales management team ultimately concluded that he was paid correctly under the terms of PAN's commission plan.  Trial Transcript, Vol. 1-B, 94:3-11.

18.     In every additional year with PAN, Godert made more money, or was on track to make more money, than he did the previous year.  Joint Pretrial Order ¶ II (7-10); DTE 16-23.  In 2015, Godert's last full year of employment with PAN, his gross income was $115,581.66.  Joint Pretrial Order ¶ II (9); DTE 21.

## III.  CONCLUSIONS OF LAW

Godert asserts two causes of action against PAN as his former employer.  First, Godert maintains that PAN owes him unpaid commissions and that its failure to fully compensate him at multiple junctures throughout the course of his employment amounts to a breach of contract.  Joint Pretrial Order ¶ I (A); Trial Transcript, Vol. 1, 12:5-13.  Second, Godert asserts that PAN misclassified him as an exempt employee under the FLSA and, because he regularly worked overtime throughout the course of his employment, PAN owes him unpaid overtime.  *Id.*  The court addresses the merits of each of these claims in turn.

### A.  Godert's Claim for Unpaid Commissions

#### 1.  *Choice of Law*

A federal court is required to follow the choice of law rules of the state in which it sits.  *Resolution Trust Corporation v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992) (citing *Klaxon v. Stentor Electric Manufacturing Company*, 313 U.S. 487, 496 (1941)), *cert. denied*, 506 U.S. 1048 (1993).  Under Texas choice of law rules, in those contract cases in which the parties have agreed to an enforceable choice of law clause, the court must apply the law of the parties' chosen state.  *Id.* (citing *DeSantis v. Wackenhut Corporation*, 793 S.W.2d 670, 678 (Tex. 1990), *cert. denied*, 498 U.S. 1048 (1991)).  In most cases, Texas choice of law principles give effect to choice of law clauses if the law chosen by the parties bears some reasonable

relationship to the parties and transaction in question and the chosen law is not contrary to a fundamental policy of Texas. See *DeSantis*, 793 S.W.2d at 677 ("An express agreement of the parties that the contract is to be governed by the laws of a particular state will be given effect if the contract bears a reasonable relation to the chosen state and no countervailing public policy of the forum demands otherwise.") (internal brackets and citation omitted).

In this case, each of the commission plans at issue contains a choice of law clause stipulating that California law applies to any potential dispute. *See* Trial Transcript, Vol. 2, 67:12-18 (docket entry 59). Specifically, the commission plans at issue all contain the following provision: "This Agreement is governed by the laws of the State of California (for Participants of the United States) or by the applicable local law outside of the United States." PTE 6 at PAN_000107. Because the defendant in this case, PAN, is based in California, *see* DTE 16 at PLTF 0001, California law appears to bear a reasonable relationship to the parties and their transactions.

However, apart from Godert's mention of the application of California law in the context of attorney's fees, *see* Trial Transcript, Vol. 2, 67:12-20, the parties seemingly ignored the choice of law clause. In fact, if anything, based on the parties' pre-trial filings, it appears that both Godert and PAN assumed Texas law applied to the breach of contract claim. *See* Plaintiff's Proposed Findings of Fact and

Conclusions of Law that Plaintiff is Entitled to Commissions at 2-4 (docket entry 43); Defendant's Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law at 6 (docket entry 47). Despite the parties' assumption, in construing a contract, the court must ascertain the true intentions of the parties as expressed in the instrument. In other words, the parties' intent comes from the agreement itself, not from the parties' present interpretation. *Mission Grove, L.P. v. Hall*, 503 S.W.3d 546, 554 (Tex. App.--Houston 2016, no pet.); *see* California Civil Practice Business Litigation § 24:9 (2017) ("A contract must be interpreted to give effect to the ascertainable and lawful mutual intention of the parties as it existed at the time of contracting."). Ultimately, for reasons discussed below, the court's resolution of whether to apply Texas law or California law is not outcome determinative in this case. But because California bears a reasonable relationship to the parties and their dealings, the court concludes that the parties' choice of law clause is enforceable and thus the court applies California law.

## 2. *Breach of Contract*

Under both California and Texas law, a party may not recover damages for breach of contract if those damages are remote, contingent, speculative, or conjectural. See *Piscitelli v. Friedenberg*, 105 Cal. Rptr. 2d 88, 113-14 (Ct. App. 2001) ("[I]t is fundamental that damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.") (internal

quotation marks omitted); *City of Dallas v. Villages of Forest Hills, L.P., Phase I*, 931 S.W.2d 601, 605 (Tex. App.--Dallas 1996, no writ); see also *A.B.F. Freight Systems, Inc. v. Austrian Import Service, Inc.*, 798 S.W.2d 606, 615 (Tex. App.--Dallas 1990, writ denied) ("The damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts.").

In this case, the essence of Godert's breach of contract claim is that PAN regularly altered its confusing array of compensation plan policies and would apply those changes retroactively in a way that regularly diminished Godert's commissions. *See, e.g.*, Trial Transcript, Vol. 2, 66:13-16; Joint Pretrial Order ¶ I (A). To support his claim, Godert provided a laundry list of large corporate clients with which he worked, including Freddie Mac, Becton Dickinson, Mars, Inc., and Miter Corporation. Trial Transcript, Vol. 1, 78:9-81:6, 82:23-83:8. Godert testified that though he worked on the accounts for these clients, he was not paid the full commission he was owed and when he complained to management about this discrepancy, his complaints fell on deaf ears. Trial Transcript, Vol. 1, 82:9-14.

In fact, according to Godert, he was often paid only a fraction of the commissions he actually earned on an account. Trial Transcript, Vol. 1, 81:10-82:15. These alleged discrepancies in pay, though Godert contends they were often the source of his complaints to management, were not reflected on pay stubs. Trial

Transcript, Vol. 1, 82:12-83:21.  Rather than providing a breakdown of the commissions he earned on each client account, the stubs merely provided a total commissions figure.  *See*, *e.g.*, PTE 11 at PAN_000262.  Also, while Godert claims to have been able to prospectively or retroactively calculate the discrepancies in his commissions pay by using information available on salesforce.com, he lost access to that information as soon as his employment with PAN ended.  *See* Trial Transcript, Vol. 1, 83:15-84:14.

When initially prompted on just how much he believes PAN owes him, Godert provided an example of one particular account on which, in his view, PAN underpaid him.  Godert speculated that on that account, he suffered approximately $800 in damages after PAN altered its policies and applied those changes retroactively.  Trial Transcript, Vol. 1, 121:1-19.  Godert further stated that his anecdotal recollection was merely one example of the types of underpayment which occurred "on multiple occasions" while he worked for PAN.  Trial Transcript, Vol. 1, 121:7-13.  Prompted to provide further specifics, Godert recalled that he suffered from this type of underpayment "[a] good half a dozen times."  Trial Transcript, Vol. 1, 121:14-19.  But despite this general assertion, Godert could not provide a specific number of instances, the specific client accounts on which PAN allegedly underpaid him, the specific amount he believes he is owed, or in which months during his tenure he disputes his commissions pay.  *See* Trial Transcript, Vol. 1-B, 2:11-4:20.

Later in his testimony, Godert was asked directly, "how much do you allege PAN owes you for commissions . . . .?" Trial Transcript, Vol. 1-B, 14:20-21. In response, Godert stated that based on his calculation and interpretation of the commission plans, he believed that he missed out on "two to three times worth of commission," which he claimed would equate to either $53,000 or $80,000 in underpayment. Trial Transcript, Vol. 1-B, 14:24-15:8. After providing these new figures, and a much longer list of clients, Godert conceded that his calculations were "[b]ased on [his] speculation pulled from documents from [PAN's] pay stubs . . . ." Trial Transcript, Vol. 1-B, 15:12-13.

Godert's final exchange with counsel for the defendant during recross examination was particularly revealing. Counsel for the defendant asked, "[s]o as you sit here today, you cannot tell the [c]ourt how much you are owed, allegedly, in commissions under the 2016 year plan. Correct?" Trial Transcript, Vol. 1-B, 28:4-6. In response, Godert stated "Correct. They didn't give me detailed information." Trial Transcript, Vol. 1-B, 28:7.

Establishing non-speculative, appreciable damages is an integral step for any successful breach of contract action brought under California or Texas law. See *Piscitelli*, 105 Cal. Rptr. 2d at 114; see also *Villages of Forest Hills*, 931 S.W.2d at 605. The plaintiff had ample opportunity during pretrial discovery to uncover documentary evidence and, at minimum, substantiated approximations of the

damages he claims to be owed. Despite this opportunity, Godert waited until trial before providing the court with speculative and wide-ranging calculations of his alleged damages.

During trial, Godert called a number of current and former PAN employees as witnesses, in part, to demonstrate the company's own lack of clarity with regard to the manner in which they calculate employee commissions. *See* Trial Transcript, Vol. 1-B, 66:1-16. While Godert is content to place the blame on his former employer for his lack of detailed information on how PAN calculated his commissions, it is Godert -- rather than PAN -- who bears the burden of proving the elements of his claim. Here, it appears that Godert failed to effectively utilize the discovery process to garner more detailed information to bolster his intuitions about underpayment.

In the absence of documentation, more accurate or consistent approximations of the amount he claims to be owed, or any evidence rising above mere speculation, the court concludes that Godert has not successfully met his burden of proof, and, therefore, he is not entitled to relief on his breach of contract claim.

B. <u>Godert's Claim for Unpaid Overtime</u>

1. *The Fair Labor Standards Act*

Congress enacted the FLSA to provide each covered employee with "[a] fair day's pay for a fair day's work," and to protect them from "the evil of overwork as well as underpay." *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 333 (5th Cir. 2017) (quoting

*Barrentine v. Arkansas-Best Freight Systems, Inc.*, 450 U.S. 728, 739 (1981)) (internal quotation marks omitted). The FLSA pursues this goal, in part, through an overtime provision, which requires an employer to compensate any covered employee who works in excess of forty hours in a workweek "at a rate not less than one and one-half times the [employee's] regular rate . . . ." *Dewan*, 858 F.3d at 333-34.

The FLSA's general rule is that "all employees must receive overtime compensation for hours worked in excess of forty hours during a seven-day workweek." *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001). Specifically, the FLSA provides as follows:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).

Although the FLSA's overtime provision appears broad, the statute contains some exemptions. Relevant here, under 29 U.S.C. § 213(a)(1), the FLSA excludes from its general overtime requirement all employees working "in a bona fide executive, administrative, or professional capacity . . . ." *Dewan*, 858 F.3d at 334. At trial, PAN argued that because Godert worked in an administrative capacity, his employment was exempt from the FLSA's overtime requirement. *See* Trial

Transcript, Vol. 2, 67:25-69:5; Joint Pretrial Order ¶ I (B).  According to Department of Labor regulations, the administrative exemption applies to employees who (1) are compensated on a salary or fee basis at a rate of at least $455 per week; (2) have a primary duty of performing office or non-manual work directly related to the management or general business operations of the employer; and (3) have a primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance.  *Dewan*, 858 F.3d at 334 (quoting 29 C.F.R. § 541.200).

When an employer asserts that the employee was exempt from the FLSA's overtime requirement, an affirmative defense, the burden of proof is on the employer.  See *Dewan*, 858 F.3d at 334 (citing *Owsley v. San Antonio Independent School District*, 187 F.3d 521, 523 (5th Cir. 1999), *cert. denied*, 529 U.S. 1020 (2000)).  Also, because the FLSA is remedial in nature, the court must narrowly construe its exemption provisions in favor of the employee.  See *Clark v. Centene Company of Texas, L.P.*, 656 Fed. App'x 688, 691 (5th Cir. 2016) (citing *Cheatham v. Allstate Insurance Company*, 465 F.3d 578, 584 (5th Cir. 2006)).

An employer's failure to prove this affirmative defense, however, does not obviate the plaintiff's burden to establish the elements of his claim.  Indeed, regardless of the merits of the employer's affirmative defense, an employee bringing an action for unpaid overtime still bears the burden of proving, by a preponderance of the evidence, "that he was employed during the time for which he seeks overtime

compensation, which requires a showing that the employer had either actual or constructive knowledge that he was working overtime." *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 Fed. App'x 448, 455 (5th Cir. 2009) (citing *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995)) (internal quotation marks omitted).

An employee must also prove "that [the employee] has in fact performed work for which [the employee] was improperly compensated," and the employee must produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005) (quoting *Anderson v. Mount Clemens Pottery Company*, 328 U.S. 680, 687 (1946)) (internal brackets omitted); see also *Bermudez v. SunRidge Management Group, Inc.*, No. 3:13-CV-4479-P, 2015 WL 12723027, at *3 (N.D. Tex. Apr. 22, 2015) (Solis, J.) (clarifying that "[a] 'just and reasonable inference' can be drawn from a plaintiff's calculation of the work and need only be approximate estimates based on the plaintiff's assumptions, as long as the assumptions rest on adequate bases") (citing *Malcolm v. Marathon Oil Company*, 642 F.2d 845, 859 (5th Cir.), *cert. denied*, 454 U.S. 1125 (1981)).

Because, for reasons discussed below, the court concludes that Godert failed to prove either actual or constructive knowledge on the part of his former employer and, further, failed to prove the amount and extent of his overtime work, the court

declines to address whether Godert was properly classified as an exempt employee under the FLSA. Although the parties devoted significant time during trial and throughout the course of litigation debating the merits of PAN's affirmative defense, the deficiencies in proof with respect to Godert's overtime claim render a determination on the whether PAN properly classified Godert as an exempt employee unnecessary. Even if it is assumed that PAN misclassified Godert as an exempt employee, Godert nonetheless failed to prove the elements of his FLSA overtime claim.

### 2. *Actual or Constructive Knowledge*

"An employer who is armed with knowledge that an employee is working overtime cannot stand idly by and allow an employee to perform overtime work without proper compensation." *Ihegword v. Harris County Hospital District*, 929 F. Supp. 2d 635, 663 (S.D. Tex. 2013) (quoting *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981)) (internal brackets and quotation marks omitted), *aff'd*, 555 Fed. App'x 372 (5th Cir. 2014). But an employee cannot perform overtime work without the employer's actual or constructive knowledge or contrary to the employer's directives and then assert a right to receive compensation. *Id.* If the employee does not notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to

pay for the overtime hours does not constitute an FLSA violation. *Id.* (quoting

*Harvill*, 433 F.3d at 441).

Constructive knowledge on the part of the employer exists if by "exercising

reasonable diligence" the employer would become aware that the employee was

working more than forty hours per week. *Von Friewalde*, 339 Fed. App'x at 455

(quoting *Brennan v. General Motors Acceptance Corporation*, 482 F.2d 825, 827 (5th Cir.

1973)). To determine whether an employer had constructive knowledge of overtime

work, courts consider a non-exclusive list of factors, including: (1) whether the

employer was in a position to see the employee's work; (2) whether the employee

could perform the job duties during regular working hours; and (3) whether the

employee performed overtime work on multiple occasions. *Bermudez*, 2015 WL

12723027, at *2 (citing *Gulf King Shrimp Company v. Wirtz*, 407 F.2d 508, 515 (5th

Cir. 1969)).

In this case, Godert asserts that PAN was either actually or constructively

aware of his overtime work for three reasons. First, Godert contends that because

PAN provided him and other inside sales personnel with a light-weight, portable

laptop, and, further, offered to reimburse him for his work-related cell phone charges,

PAN anticipated that its employees would work overtime. *See* Trial Transcript, Vol.

1, 49:14-21, 50:1-6, 51:12-25. Second, Godert provided an email dated March 5,

2014, sent from his former supervisor, Hemphill, to a number of members of the

inside sales team, including Godert, in which Hemphill stated "[w]e'll also begin doing overtime as needed, in order to catch up." PTE 22 at PLTF 261. Third, Godert testified that PAN actually instructed him and other members of the inside sales team to complete overtime work. *See* Trial Transcript, Vol. 1, 54:3-57:4.

On the one hand, Godert's evidence appears to show that PAN was actually or constructively aware that at least some of its employees worked overtime -- exempt status notwithstanding -- sometimes. On the other hand, to recover on his overtime claim, Godert must establish that PAN was actually or constructively aware of *his* overtime work. As Godert's former supervisor testified, all inside sales personnel had a laptop and both inside and outside sales personnel were permitted to request reimbursement for their work-related cell phone charges. Trial Transcript, Vol. 1-B, 37:23-39:14. Hemphill also revealed that as a supervisor, he took a hands-off approach, allowing the inside and outside sales personnel to work as a team. *See* Trial Transcript, Vol. 1-B, 41:19-42:10. In other words, Godert's supervisors did not micro-manage his daily tasks, so they were likely unaware of his daily work practices, particularly any that extended beyond the four corners of the office. Additionally, as PAN noted during closing argument, Godert provided no evidence that he disclosed his claimed overtime work to any PAN representative. Trial Transcript, Vol. 2, 71:12-20. From the evidence provided, it appears that while Godert was seemingly a diligent and well-respected employee at PAN, and though he may have voluntarily

worked outside of the office in some instances to maintain the quantity and quality of his work, Godert failed to demonstrate that PAN was actually or constructively aware of any of his alleged extra hours.

### 3. *The Amount and Extent of Overtime Work*

Under the Fifth Circuit's standard, in evaluating whether a plaintiff met his burden to prove "the amount and extent" of overtime work, the court may draw inferences from oral testimony, sworn declarations, and any other relevant documentary evidence the plaintiff provides. *Bermudez*, 2015 WL 12723027, at *3. And, while the plaintiff's evidence may be anecdotal and imprecise, mere assertions will not suffice. *Id.* (citing *Harvill*, 433 F.3d at 441). If the employee produces sufficient evidence as to the amount and extent of overtime work completed, the burden shifts to the employer to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Johnson v. Heckmann Water Resources (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014) (citing *Harvill*, 433 F.3d at 441)). "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Von Friewalde*, 339 Fed. App'x at 455 (quoting *Anderson*, 328 U.S. at 688)).

In a similar case from the Southern District of Texas, the court concluded that the plaintiff's unsubstantiated assertions of the average number of hours she worked

off the clock were insufficient to survive the defendant's summary judgment challenge. *Ihegword*, 929 F. Supp. 2d at 668. In *Ihegword*, the plaintiff conceded that she did not know with any precision the number of extra hours she allegedly worked, but she did claim that she worked, on average, an additional four hours every shift, which, based on her work schedule, added up to twelve additional hours every week, or fifty extra hours every month. *Id.* at 667. The plaintiff also claimed to have kept a log of her alleged overtime hours, but maintained that when her employment ended, she was not permitted to retrieve the log or any of her other personal belongings. *Id.* Without evidence beyond unsubstantiated and speculative assertions as to the average number of extra hours alleged to have she worked, the court held that the "plaintiff . . . failed to raise a genuine issue of material fact for trial." *Id.* at 668.

In another case, *Harvill*, the Fifth Circuit concluded that the district court did not err in granting the defendant's motion for summary judgment where the plaintiff "offer[ed] absolutely no evidence that she actually worked the hours she allege[d]." *Harvill*, 433 F.3d at 441. On appeal, the only allegation the plaintiff in *Harvill* added to her argument was a bare assertion that "she worked 210 hours of unpaid overtime." *Id.* In discussing the plaintiff's assertion, the Fifth Circuit stated that "[a]gain, she offers absolutely no evidence that she worked the hours she allege[d], or

that [the defendant] was aware that she worked overtime hours without compensation." *Id.*

Here, Godert speculates that while he did not keep track of his exact number of overtime hours, he worked roughly ten extra hours each week throughout the course of his employment with PAN. Trial Transcript, Vol. 2, 64:6-7. According to Godert, his supervisors expected him to work overtime to ensure he hit a monthly quota. *See* Trial Transcript, Vol. 2, 64:13-16. Though Godert concedes his normal routine was to work at the office from 7:00 a.m. to 4:00 p.m. during weekdays, he testified that his extra time came in the form of 15 to 20 minutes every morning before work, Trial Transcript, Vol. 1, 60:16-61:12, one to two hours per week on the way home from work, Trial Transcript, Vol. 1, 61:14-62:3, between an hour and an hour and a half in the evenings after work, Trial Transcript, Vol. 1, 59:11-16, and, sometimes, on weekends, Trial Transcript, Vol. 1, 62:6-18. Attempting to substantiate his assertions, Godert provided nothing more than general descriptions and anecdotes about the nature and frequency of this alleged overtime work. *See*, *e.g.*, Trial Transcript, Vol. 1, 55:20-57:9.

In response to Godert's claims, PAN provided concrete evidence in the form of badge swipe records and video surveillance footage of his entrances and exits at the office. *See* DTE 24-25. Despite limitations in PAN's evidence with respect to video quality and the relatively short time period of surveillance video collected (only six

months of Godert's approximately two and a half year employment with PAN), PAN nonetheless successfully demonstrated that Godert had a regular routine of arriving in the office around 7:00 a.m. and leaving around 3:00 p.m. or 4:00 p.m. *See* DTE 24; DTE 25. Given PAN's evidence, Godert rested his overtime claim on work outside the office. But, rather than providing tangible evidence in the form of, for example, phone records, a collection of time and date-stamped emails, or even a personal log of overtime hours, Godert asks the court to award him overtime based solely on his bare, speculative assertions.

The court is mindful of recent appellate precedent stating that when employers, for whatever reason, fail to keep records of an employee's hours, and "employees thereby have no way to establish the time spent doing uncompensated work, the remedial nature of the FLSA and the great public policy which it embodies . . . militate against making the burden of proving uncompensated work an impossible hurdle for the employee." *Garcia v. U Pull It Auto & Truck Salvage, Inc.*, 657 Fed App'x 293, 298 (5th Cir. 2016) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, __ U.S. __, 136 S. Ct. 1036, 1047 (2016)) (internal brackets and quotation marks omitted). But to establish a claim for overtime compensation, a plaintiff must do more than simply aver that he worked approximately ten hours of overtime every week during his employment to ensure he met his monthly quota. See *id.* In light of

the above-mentioned binding and persuasive precedent, the court concludes that Godert failed to establish the amount and extent of his overtime work.

In sum, because he failed to prove that PAN was either actually or constructively aware of alleged overtime work completed outside the office, and because he failed to demonstrate the amount and extent of his overtime work, the court concludes that Godert is not entitled to relief on his overtime claim.

IV.  <u>CONCLUSION</u>

For the reasons stated above, Godert is not entitled to relief on either of his claims.  Judgment will be entered for PAN.

**SO ORDERED**.

November 30, 2017.

A. JOE FISH
**Senior United States District Judge**